Good morning. We'll proceed to hear argument in the one case on calendar for this morning, which is 25-3826, City of Huntington Beach et al. v. Gavin Newsom et al. And we'll hear first from Mr. Sherr. You may proceed. Thank you, Your Honor. Gene Sherr, representing the parents. And I'd like to save five minutes for rebuttal. Let me first thank the panel for your timeliness. You're holding this hearing so quickly and for the standing analysis in your motion decision. For reasons that I'll explain in a few minutes, we respectfully think that you reached the wrong result in that decision as to at least one of our plaintiffs. But we do appreciate your laying out a roadmap by which we believe we can establish standing to your satisfaction. And if you're not persuaded on the evidence that I'll discuss today, we ask for an opportunity to follow your roadmap back in the district court, which, as you know, found that we had standing as to four of the eight plaintiffs that are still in this case. But before addressing standing, let me briefly lay out some general background on the law at issue and then explain our two central claims, a clear understanding of which is critical to a full appreciation of the standing issues. As the court is no doubt aware, AB 1955 was part of a national movement to address children who may experience gender incongruity. And it's a serious issue. As discussed in Justice Alito's recent concurrence in the denial of cert in the Lee case and in his earlier statement in the Eau Claire case, however, some in that movement believe that school personnel are really better than parents at dealing with those issues. But, counsel, the only defendants we have in this case are state defendants. You did not in this case sue the district. So the question is whether or not your injury is traceable to the provisions of this law and would be redressed by a relief directed at validating that law. And the issue we identified in the prior order was that the district court construed the state law as prohibiting the disclosure of the information when that does not seem to be supported by the text, which merely seems to preempt mandatory disclosure policies and therefore leaving open voluntary disclosure by individual employees. Can you address that issue? That's right. And in that regard, Your Honor, AB 1955 is quite similar to the law that the Supreme Court struck down in Romer v. Evans. You'll recall in Colorado they adopted by initiative a law that prohibited local governments and the state government from enacting any laws or policies protecting certain members of the LGBT community. And the Supreme Court obviously invalidated that. And that's what AB 1955 does here, is it prohibits local governments, local school boards, from adopting policies that would require- If an individual teacher, say the homeroom teacher for a class, sees that and learns that a child is experiencing gender dysphoria and decides I'm going to call the parents and let them know that, does AB 1955 prohibit that parent from making that call? No. But what it does is it allows the homeroom teacher in that hypothetical to begin a social transition on the child without telling the parents and AB 1955 protects that teacher from any consequences. And that might be a good theory and claim to make if you had sued the school districts as additional defendants. But you have to trace the injury to AB 1955. And if all it does is prohibit mandatory policies and leaves it up to the discretion of the teacher, then it's not clear that you've established that any teacher or any school district would otherwise have provided the information in the absence of 1955. And that seems the core of the standing issue. What's your response on that? Your Honor, we can do that today as to Plaintiff 7A. Plaintiff 7A resides in Orange County. This is not all in the complaint, but, in fact, the Orange County Board of Education adopted a resolution on August 8th of 1924 criticizing AB 1955, saying they did not want to comply with it. The day before, they joined a lawsuit with some other school boards around the state expressly challenging AB 1955. The Court can take judicial notice of those two things, or we're happy to provide a motion for the Court to take judicial notice of those. But those clearly establish that in Orange County, where 7A resides, if he went to the school board and requested help absent 1955, they would be willing to adopt a policy requiring disclosure or, at a minimum, as has happened in a number of schools before AB 1955, at a minimum reach an agreement with him that he would be notified. You will, the only, as I construe the complaint, the only plaintiff who, as to whom you allege, did have an agreement for disclosure was Plaintiff 1A who didn't appeal.  Do you have another one who has similar facts or could allege similar facts? Because 1A looks like the one person who could have satisfied the standing analysis that we identified in the order, but 1A didn't appeal. Correct. But all of the plaintiffs could seek such agreements with their schools absent 1955. It's not enough for standing. That someday hypothetical in Lujan says that isn't enough. Well, there may be a difference between, on this point, between the pleading standard and the standard for a PI. Right? Under the PI standard, you have to make an evidentiary standard. Certainly in our pleadings, we have adequately alleged that absent 1955, parents would be free to seek those kinds of agreements. And we know from 1A's experience that some parents have been successful in seeking those agreements before AB 1955. But you said in paragraph 367, and we've flagged this in the order, that some of the parents lived in communities and school districts with family-friendly policies requiring schools to inform parents if the schools had been asked to facilitate social transitioning and that AB 1955 ends those policies. Could you amend that paragraph to specify specific school districts that had such mandatory policies that were preempted, and which school districts are those? Off the top of my head, I don't know which school districts they are, but we would be happy to amend to do that. Can I ask you about 7A? Yes. If I look at the complaint on 7A, the parent 7A is repeatedly on notice about 7C using a different name, different pronouns, like repeatedly. If I look at the preliminary injunction declaration, we can discuss whether that's appropriate or not. There's so many instances during freshman year, summer after freshman year, during sophomore year, just repeatedly. So if the parent has this much information, don't they have, number one, the information that they're requesting, and number two, enough information to direct the medical care and treatment of the child? I'm hoping that you can explain what the burden is, because particularly with 7C, there is so much information. The parent has already been investigated by Child Protective Services, has had multiple communications with counselors. So I guess I'm still unclear. What's the burden if 7A already knows about 7C? Well, what is 7A going to do about it? I mean, in that respect, this is somewhat similar to the Mahmoud case, where the people who were defending the policy that was ultimately struck down in Mahmoud, they said, well, if you don't like this, you can just take your kids out. And, yes, parent 7A probably has enough notice about the child's gender economy. So would you concede that the right to information has already been satisfied? Because you're requesting the right to information and the right to direct the medical care and treatment of the child. So what is the information that you need? There's so much information in both the complaint and the declaration about 7C's gender identity issues. What more do you need? I mean, the parent is calling and the school district says, we don't have a kid by that name. 7A is saying, you've got to use 7C's real name, real birth date, real address. They can't find her student ID because it's under a male name. And so, like, just time and time again with different counselors, 7A is having these conversations with the school. So what information does 7A need? This is where the district courts and the state's mischaracterization of that claim, count three, is important. The chief bit of information that parent 7A needs is, is somebody at the school trying to transition my kid. Okay? That the parent has not been able to get. And under AB1955, parent 7A cannot get it unless somebody at the school gives it to her voluntarily. But you would agree that AB1955 doesn't require a student to change his or her name or their name or to change their pronouns, right? It doesn't require. And it doesn't require a teacher or a counselor, any school administrator to use a name or a pronoun that a student asks them to use, right? Also true. Okay. It also doesn't give the school or a teacher or a counselor the authority to decide whether a student says, I want a new name, I want new pronouns. Well, that's where I disagree. Okay. How does it do that? AB1955 certainly does that. How does it give them the authority to do that? In two ways. Number one, it prohibits the school and anybody controlling the school from adopting policies prohibiting that. And it also protects the teacher who chooses to do that from any consequence for that. So if that's not authority, I don't know what is. And that's the fundamental problem, is that it transfers the authority over social transitions from parents to the school and the child. But you would agree, I think you agreed when you were talking with Judge Collins, that a teacher or counselor could refuse to use a requested name or pronoun and could inform a parent, even under AB1955, correct? That a student had made that request. That's possible. Okay. That's possible. But the concern and the reason parents are so up in arms about AB1955 and these kinds of policies around the country is because it transfers authority from them to individual teachers or counselors to decide whether to transition their kids, which, by the way, according to the medical evidence. But how are you just, I guess it's the student that is asking for a different pronoun or name to be used. We don't know that. In a lot of cases, teachers have been found to push that, to push social transition on kids. But you're saying 1955 requires counselors or teachers to push a student to use a different name? I'm not quite seeing that. Again, that's not what I'm saying, Your Honor. The problem is transferring authority from parents to school officials in consultation with students, but transferring authority from parents to school officials to make those very fundamental decisions in which, by the way, the child's future ability to become a parent is at stake. That's the end result, according to the medical evidence, that is the end result of social transition in a high percentage of cases is the kid goes on to get invasive surgery that makes them permanently infertile. And so that's a matter of great concern to parents. It's not just a knee scrape or something where a school teacher is providing a little bit of care. If you were given leave to amend on remand to attempt to address the issues of standing and redressability, what specific amendments would you make? Would you identify mandatory policies that would otherwise have existed in schools? Would you add additional defendants? Would you challenge additional California laws? What changes would you make? I don't anticipate that we would challenge additional California laws, but we certainly would, again, if in order to establish the chain of causation that you're looking for for standing, if you say we have to have the schools as defendants, then we can certainly bring the schools in as defendants. That's no problem. Now, the reason we didn't do that is because if we had sued the schools, they would have said, well, our hands are tied by AB1955. We really can't do because of California law what you're asking us to do. But if you think that's necessary to square the causation point, that's certainly something that we could do and would do on remand. Can I ask you a question since you mentioned Mahmoud? In your opening brief, you say that Mahmoud didn't require anything regarding the curriculum or policy, but there's language in Mahmoud that says that it requires the parents to submit their children to instruction. That poses a very real threat of undermining their religious beliefs and practices. It says the board requires teachers to- Assuming they stay in the school. That's correct. But the board requires teachers to instruct young children using storybooks that explicitly contradict their parents' religious views. And in Mahmoud, the opinion specifically states, we have recognized the potentially coercive nature of classroom instruction of this kind. I like that quote. So I understand, and that's the law that we are going to follow. But where is the coercion here? And do you agree, you said in your opening brief that the curriculum and policy in Mahmoud neither required nor prohibited parents or children from doing anything other than omitting a means to opt out of the instruction. But that seems to be in tension with the quotes I've just read from the opinion that says there's coercion here. There's requiring parents, if they want to stay in the public school system, their children have to be subject to these books. Well, if our description of Mahmoud wasn't sufficiently accurate, I apologize. But indeed there is coercion here, obviously. And this was the problem the court talked about in Mahmoud. It's very expensive for parents to take their kids out of public school and put them in a private school. And so basically what AB 1955 says, it says to parents, is if you want to be able to control this very important decision about whether your child is going to be socially transitioned, basically your only choice is to take them out of public schools and put them in a private school. And that was exactly the choice that Mahmoud said parents cannot be faced with. I want to make sure I understand the substantive scope of your constitutional claim. Is it your position that the federal constitution requires the mandatory policies that 1955 preempts? I don't know that it requires the policies necessarily. It requires parents to be able, at a minimum, to meaningfully seek agreements with their schools. One of your claims is specifically styled as a right to information. Right. And that would seem to assert that the constitution requires mandatory disclosure to parents. And I wanted to know whether that was your position or something else. Well, I think our position is perhaps a bit narrower than what you've stated. It's the right not to have government officials conceal that kind of very important information from parents. I'm not sure I understand the difference between a right not to have the information concealed and a right to have the information disclosed. Help me out there. Yeah, the problem in the school setting is, and again, we've seen this all over the country, teachers and counselors, well-meaning, no doubt, will sometimes begin socially transitioning kids and then affirmatively hide it from parents. They will tell the child, you can't tell your parents, and they will prohibit other school officials from disclosing that to parents. I mean, 7A is a classic example. Right?  after trying to get the school to acknowledge her daughter's true name, for example, the school ultimately said, we're not even going to acknowledge your daughter's real name, your daughter's birth name. Any agency of any of these students? I'm sorry? You're saying it seems like your position is the schools are all doing these against the will of the students, that they're starting it, not at the student's request? No, that's not what I'm saying. Okay. It's a mix, is the problem, but the real problem is that whether it's initiated by the child or the teacher or counselor, it's still taking that decision away from the parents who are constitutionally entitled to make that choice, and not the school. Do you want to save some time? Actually, I'm sorry, I have more questions, if that's okay.  All right. So if we were to find that the plaintiffs do not have standing, then we would not have jurisdiction to address the merits. Is that correct? I think that's fair. Okay. But, again, what I understand you disagree on the issue of standing. Right. It's the PI versus the dismissal, right? And that's part of what we're appealing here is the dismissal, and that turns on the allegations that we made in our complaint. Right. And we should look just to the allegations of the complaint, not to the PI declarations in determining standing for the motion to dismiss, correct? For a motion to dismiss, I think that's fair. Okay. Thank you. If AB 1955 is With one exception. Go ahead, please. The Jones decision from a few weeks ago suggests that in making a standing determination, you can also consider subsequent developments in the case, including evidence that's been presented. But the other thing, the other question I had is the standing deficiency that we identified in the preliminary injunction, preliminary injunctive relief order, that was not a deficiency that was identified in the district court, because it was based on a rejection of the district court's reading of the statute. So you've never been given an opportunity to plead facts with respect to that specific deficiency. That's exactly right. Okay. Right. So let me ask, there's a point that's made and I just want to understand it. With regard to the federal FERPA, you know, it has a right of parents to inspect and review the education records of their children. It defines those records as information related to their students. And similarly, the reg also gives that right to inspect and review the students' education records. The California state statutes gives the parents the right to observe the classroom in which their students are enrolled, have access of the school records. And I guess I'm, why isn't this sufficient, in your view, to get the information that you need? These parents could go observe the classroom. They could access all of their students' records. They have a right to it under federal and state law.  But what they don't know is what parents and counselors are doing privately with their children, conversations that they're having privately with their children. Yes, certainly a parent can avail himself or herself of those things and obtain some relevant information. But again, when you're faced with a legal regime, which AB 1955 creates, that protects teachers and counselors in their efforts to transition children, and that can be done in a lot of different settings at school that wouldn't necessarily be covered by those authorities. There's still a gap. I'm sorry to interrupt you, but if you observe a classroom, wouldn't you see how a student is being referred to, either by pronoun or by name? You might, or you might not, or the teacher and the student might decide not to even use pronouns that day, or not to even use names. So one last question, and I thank Judge Collins for giving me the time. If I were to use someone's preferred pronoun, am I giving them medical treatment and medical care? Merely using their preferred pronoun? Yes, or their preferred name. Am I administering medical care or medical treatment? I think it depends on the context. You know, if you're a friend and not in a position of authority, I would probably not call that medical care. But I think if you're in a position of authority, as a school counselor or a teacher, that is one aspect of providing medical care. Under Doe v. Horn, and I'll add, I think even if you reject the idea that what teachers and counselors are doing when they try to transition kids is medical care, the right that we've identified doesn't depend on it being medical care. There's no question that gender dysphoria is a very serious condition, and as we've discussed, it has potentially life-altering consequences. So I can't imagine a world in which a parent's right to information about that and a parent's right to control that decision would depend on whether you call it medical care or psychological care or mental health care or something else. It's a decision that has potentially grave life-altering consequences and one that parents have a constitutional right to control. All right. We've taken you substantially over, but I'll give you five minutes for rebuttal. Thank you, Your Honor. All right. And we'll hear now from Ms. Veroft. Did I pronounce that correctly? You did. All right. Thank you. Good morning, Your Honors. Julie Veroft for the State Defendants. The court can resolve this appeal on the same grounds it resolved plaintiff's motion for an injunction pending appeal on causation and redressability. As the court explained in that order, AB 1955 only prohibits policies categorically requiring school officials to out LGBTQ students. AB 1955 does not provide… Could the plaintiffs be given leave to amend? The district courts granted the 12B1 motion with allowing the option for plaintiffs to seek leave to amend as to the parent plaintiffs. As I just pointed out in my colloquy with counsel, the particular deficiency that we identified was never identified in the district court. Indeed, we rejected the district court's reading of the statute, which if the district court had been correct, would moot our analysis. So, now that we've identified a new legal defect that was never identified in the district court, they never had a chance to meet that deficiency, how could we not remand the case to give them a chance to try and satisfy that standard when they've said that they could do so? We don't oppose remand for plaintiffs to have an opportunity to ask the district court for a leave to amend. It's notable to me that my friend wasn't able to identify to you which parents fit the some parents allegation in paragraph 376, but we don't oppose them asking the district court for permission to do so in the first instance there. Okay. Wait, but you do oppose if this court gives leave to amend. Oh, we don't, Your Honor. Okay, so you don't. But what were you going to say before, that the district court had previously granted leave to amend and the plaintiffs chose not to amend? So, as to the 12B1, Your Honor, the district court granted the motion to dismiss with prejudice as to the city, but not with prejudice as to the parents. So, we read the order to allow the possibility to plaintiffs to seek leave to amend as to the parent plaintiffs. In addition to the causation issue that Your Honor is asking. If we can go to, I understand that we had discussed in the PI, the decision relating to the PI, Section 6A of AB 1955, which was about policy. But then there's also Section 5A, which says, an employee of a school district shall not be required to disclose any information related to a people's gender identity without the people's consent, unless otherwise required by state or federal law. So, under this following hypothetical, say a parent goes to a school principal and says, I want to be informed about my child's potential gender identity issues, and makes a very compelling case. And the principal agrees, yes, in this circumstance, I think you should be notified if something like that happens. But under Section 5A, the school principal can't require the teacher to disclose that information to the parent, if the student doesn't agree. Isn't that right? That's a question of state law, Your Honor, that's to my knowledge not been litigated and resolved. I think that's probably right, but we don't have that particular issue presented here, because as it was acknowledged in the conversation with my friend, Parent 1A is the only parent to have alleged any effort to form such an agreement, and none of the parents with live claims here have any allegations along those lines. Well, I guess it was because prior to AB 1955, they could ask the teachers for that information. And I think, for example, Parent 6A asked the teacher, and teacher agreed and provided that information. But now, under the statute, here, if the parent went to the principal, the principal could require the teacher to disclose that. Well, that exact fact or scenario may not be present, but a lot of that is pre-AB 1955. That's true, but even assuming AB 1955 forecloses those kinds of agreements, AB 1955 doesn't prevent or prohibit disclosure in individual cases. So to the extent a parent doesn't receive information from a school official about their child's gender identity, that nondisclosure is not compelled by AB 1955. It's the result of a school official's independent decision or perhaps the operation of a school district's nondisclosure policy. So do you concede that nothing in California law would prohibit the homeroom teacher and the hypothetical I had before from calling the parent and disclosing against the child's wishes that the child has requested gender transitioning and different pronouns, etc.? It would probably depend on the details, Your Honor. There are other state laws that constrain disclosure in certain circumstances. For example, the State Equal Protection Clause, state anti-discrimination statutes, state privacy laws. But as a general matter, those state laws don't prohibit disclosures in all circumstances. The Attorney General's legal alert that we said in our opening brief, for example, explains that school officials remain free to disclose a student's gender identity to advance the student's well-being where the school official deems that necessary or appropriate. Why wouldn't anti-bullying or anti-harassment programs be an adequate alternative? Anti-bullying or anti-harassment programs might address how students treat other students at school, Your Honor, but it wouldn't be responsive to the concerns that animated the adoption of AB 1955. The legislature found that depriving LGBTQ young people of any agency over when they share their identities with their parents undermines their ability to build trusting relationships with their parents. Anti-bullying initiatives wouldn't speak to that problem. It also wouldn't speak to the finding of the legislature that a significant number of young people face parental rejection. Can you speak up or maybe pull the microphones a little closer? Apologies, Your Honor. Is that better? Great. I'll adjust for the vertically challenged among us. Would it be helpful for me to repeat my response to Judge Coe? One of the legislature's reasons for adopting AB 1955 was its finding that when you deprive LGBTQ young people of any agency over when they share their identities with their parents, it undermines the ability of those young people and their parents to build trusting relationships with each other. The legislature recognized the importance of those relationships and thought it appropriate and reasonable not to require school officials to interpose themselves between parents and children in a way that would threaten those relationships. And to Judge Coe's point, anti-harassment or anti-bullying initiatives between students at school wouldn't be responsive to that finding. Now, I notice both provisions of AB 1955 say that they're declarative of existing law, that the legislature provided additional detail but didn't think it was substantively changing things. And as I understand it, the state sued the Chino Valley District and obtained a prohibition on their mandatory policy before AB 1955 took effect. Am I correct on that? That's correct, yes. It's long been the state's position that forced outing policies violate other provisions of state law. Okay, so in order to – suppose we found that someone had standing. I mean, suppose plain of one name were here. And would an injunction just against 1955 redress the injury? Because it seems like other provisions of California law would still be standing and would not be affected by that potentially. Does that create a redressability issue in your view? That's right, Your Honor. My friend here could have chosen to sue school districts, school officials, could have chosen to challenge other state laws. But the narrow nature of the suit here, both the defendants and the relief sought, creates a serious causation and redressability problem. Okay, but again, he suggested on remand he would consider making any amendments that might be necessary to address the standing deficiencies. And so would the state be opposed on remand to amendments that might add additional defendants or additional claims in order to resolve the standing issue and essentially get to the core issues that they're raising? We'd have to see the motion for leave, the details, the reasons for not bringing those to the court first. This would be the second amended complaint, not the first. But we would look at those the way we would look at any motion for leave to amend and respond accordingly. Let me ask you, you know, footnote 13 in Doe v. Horn does seem to say that social transitioning is medical care and medical treatment. And you concede that parents have a fundamental right to direct their children's medical care. So then why don't you explain how there's no infringement of that right here? We don't dispute that social transition is sometimes recommended as a way to alleviate symptoms of gender dysphoria in much the same way that exercise is sometimes recommended as a way to alleviate symptoms of postpartum depression. But it doesn't follow that using a transgender person's name and pronouns or leading a postpartum woman in a yoga class is itself an act of medical care. Medical care is conduct regulated as part of the practice of medicine to be provided by licensed healthcare professionals. Using a transgender person's name and pronouns is something that people do all the time in all contexts as a matter of civility and respect. It's far afield from anything that the Supreme Court or courts of appeals have ever recognized as the conduct giving rise to a substantive due process right to direct medical care. You know, you cite case law about how, you know, parents don't have say in the curriculum schools. And there's certainly case law that says that. But do you think Mahmoud undermines that? Mahmoud is a free exercise case, Your Honor, not a substantive due process case. So, no, we don't read it as bearing on the substantive due process line of cases, the Pierce-Meyer cases. And I also don't understand my friends to have articulated a Meyer-Pierce substantive due process claim here. Furthermore, the facts in Mahmoud were fundamentally different. There, as Your Honor was suggesting earlier, there was a requirement for in-classroom instruction, using particular books, direction to teachers to dissuade students who expressed views discordant with those in the books. AB 1955 here doesn't require students to do anything. It doesn't prohibit them from doing anything. It doesn't require parents to do anything or prohibit them from doing anything. It doesn't involve curriculum. The challenge provisions only arise when the student on their own initiative says, I identify as transgender. When the student says, please don't share this information with my parents without my consent. The factors that created concern for potential coercion in Mahmoud simply aren't implicated by AB 1955. Are there any other laws in California that give basically a veto right to a student to say certain information shouldn't be disclosed to their parents? I'm sorry, Your Honor, you said that it would give students a veto right? Yeah, are there any other laws in California that gives a student a veto right and say, please don't tell my parents about, you know, X or Y or Z? There are some of those laws are detailed in the professors of psychology and human development amicus brief, and I believe some may be detailed in the California Teachers Association amicus brief. There are rules around student pregnancy, student participation in substance abuse programs, things like that where students have a presumption of confidentiality as to those issues. And have such a confidential visa be their parents. Correct. Are any of those implicated with gender identity or their pregnancy, substance abuse? I don't know that there are laws specific to gender identity that are referenced in this brief, Your Honor, no. Why wouldn't a, you know, restricting disclosure only when the parents are unfit? Why would that be unworkable? Why would that necessarily out a child? It's hard to imagine how to do that inquiry on a case-by-case basis, Your Honor, where the parent wouldn't have a reason to think that the child is transgender or gender nonconforming. There's no practical way for school to do that inquiry for every single parent. And so if they were doing it in a targeted way, it could necessarily out the child. Doing that kind of inquiry could also chill young people from expressing their identity. For example, the legislature found that a significant number of LGBTQ young people don't report when they experience harassment or bullying or discrimination based on their identity because they fear being outed to their parents without their consent. Certainly, I mean, if a child is experiencing gender dysphoria or gender confusion, that indicates the child is experiencing some measure of mental distress. And, you know, the allegations of the complaint show at least some instances in which counselors in the school have taken upon themselves to have sort of counseling sessions to sort of encourage the child in one direction or the other. Is it your view that states have the right to engage in that kind of shaping and setting the direction of the children's life when they're experiencing significant mental distress and to do so secretly from their parents? A few responses there, Your Honor. One, AB 1955 doesn't prevent a school official from deciding. Well, that's getting back to sort of the standing issue. But I want to know the substantive positions. Suppose we found standing, we had a plaintiff who had standing, et cetera, and we had the substantive constitutional issue in front of us. I want to know what your position on that is. Well, we'd say two things, Your Honor. First, as to whether the asserted liberty interest is a fundamental right. Here, the liberty interest that my friends are asserting is a right to direct their child's medical care. And in the state's view, respecting a transgender person's name and pronouns is not an act of medical care. It just seems hard to square that with what Joe B. Horne said, because Joe B. Horne specifically says in the footnote that the medical treatment for gender dysphoria has a number of components, and this treatment can include, and the first thing that's announced is the use of gender pronouns. So aren't we bound by what we've said in Horne? Horne addresses the fact that social transition can be a way to alleviate symptoms of gender dysphoria, that it's sometimes a recommended treatment for gender dysphoria, but it doesn't follow that every instance of respecting a transgender person's identity is medical care. There are all sorts of things that are recommended in response to medical issues that are not themselves medical care. Exercise, deep breathing for anxiety, and so forth. And school officials often provide supports to students, seating a student with vision challenges closer to the board, ensuring a net-free environment for students with serious allergies. But those learning supports are not in and of themselves medical care. But even setting the question of whether there's a fundamental right implicated here aside, part of the due process analysis requires asking, is there infringement of that right? And here, there's no infringement by AB1955. In cases concerning infringement of a substantive due process right, we see some element of coercion, compulsion, active interference in the parent-child relationship. AB1955 doesn't do any of that. Could the state adopt a law that forbade school districts from disclosing that the student had expressed suicidal tendencies? Very difficult to imagine the state adopting such a law. No, I know. That's why it's hypothetical. But I want to know how far your position goes on the constitutional issue. Can the state adopt such a policy? I don't think such a policy would implicate a substantive due process right to direct a child's medical care. It should be subject just to rational basis. Maybe it would fail that, but is that your… It may well implicate other strands of substantive due process rights that my friends haven't raised here. For example, there are cases where parents sue school officials for particular negligent behavior that results in harm to the child that causes a loss of companionship or otherwise interferes with the family association between the parent and the child. That species of substantive due process could be implicated by the type of policy your honor is identifying. So there's some substantive due process right to some information about the child's mental well-being. And it's a question of where the line is? In general, there is no substantive due process right to compel school officials to provide information that parents deem helpful. In the very extreme hypothetical that your honor is… But you just acknowledged that there was something there, and then it's a question of where the line is. Potentially for suicide or something quite acute, and there already are a number of laws that would require disclosure in those very acute specific circumstances. But courts repeatedly, as the district court collected, have rejected a notion that parents have a substantive due process right to compel information that is just generally helpful. And here, the law issue is just speaking to disclosures of gender identity, gender expression, not the particularly acute situations your honor is identifying. And I don't think this case calls upon the court to articulate exactly the bounds of the parental substantive due process right, but simply to say that those rights are both not implicated here and certainly not infringed upon by AB 1955. Where is the law that the school should give the parents information to protect the health and safety of the student? The federal FERPA statute, or where do we find that? There's mandatory reporting requirements on school officials, your honor. There's a provision we cite in our opening brief, I believe, about when school mental health counselors can or should disclose to parents if a child has experienced particularly acute distress. You had earlier mentioned the amicus brief about other laws that may give a veto right to the students. But those, I'm just looking at now, those laws relate to information provided to a mental health provider. So there's a confidentiality issue, right? Yes, if that's right. Those are obviously separate privilege involved. But are there any other laws that don't relate to certain privilege where a student has a right to veto information being provided to their parents? I'm not aware of other laws that implicate that particular issue, your honor, outside of the school counselor. But again, AB 1955 doesn't give students a blank check veto. AB 1955 allows for disclosures in individual circumstances. It only prohibits requiring disclosures in all circumstances. But I'm looking at California Education Code 49602. And it does provide a confidentiality exception that would allow disclosure of information to a parent or to a school principal to avert a clear and present danger to the health, safety and welfare of the student. Is that the law that you're referring to? Yes.  Thank you. Well, if there are no further questions, I see that my time has expired. And so we would ask that the court affirm the dismissal of plaintiff's claims. Thank you very much. All right. Thank you, counsel. We'll hear rebuttal now. Thank you. Let me go back to counsel's description of the legislative history of this provision, which I think makes crystal clear that this law was intended from the outset to be a challenge to parental rights. Counsel talked about how the focus was on student agency in the face of objections from their parents. And it's clear that the law was designed to and does transfer control over this very important decision about social transitions from parents to some combination of teachers and students. And contrary to counsel's characterization, we do believe that is a flat violation of parental rights as articulated in Supreme Court decisions going all the way back to Meyer and Pierce and the whole line of decisions since. Is your argument that schools have an affirmative duty to disclose any gender dysphoria issues to the parents or that the schools must disclose that information when a parent requests it? Certainly the latter. When they request it. I don't think we would suggest that they have an affirmative obligation to provide information that's not even requested. But they do have an obligation not to try to hide it when parents try to find out about it. Okay, but if a parent knows enough to ask, don't they have enough information to direct their child's medical treatment and care? No, because they may get lied to by school officials. Or they may be the subject of evasion. And again, that's what AB 1955 empowers. I'm sorry. I thought you were saying you agree that under Supreme Court law, the Due Process Clause doesn't require an affirmative obligation on the school to disclose. So it only is when the parent asks the school, does my child have gender dysphoria? Is having any gender identity issues in school? Then the school must disclose that information. But if the parent has enough information to even ask the question, isn't that enough information to direct their child's medical care and treatment? No. Why not? Well, because they may not have the information they need. I mean, you know, if I were a parent today in some of the schools where our clients attend, I would be very worried about my kids being socially transitioned, even if they showed no signs whatsoever of gender identity issues. And even if I had no information about that, because a parent doesn't know what a parent doesn't know. And so because of AB 1955, parents have to live in constant fear that if they send their kids to public schools, somebody in the public school, you know, without even any warning or suggestion of gender dysphoria, might try to put a kid on a path towards a gender transition. And that's one of the fundamental problems with the law. I'd like, if I could, also to... A question about the scope of any remand or what we could say in connection with any remand. If we were to determine that the current allegations of the complaint are insufficient, even taking into account the material in the preliminary injunction declarations is functioning as a sort of existing proffer in the record, if we would find that to be deficient, but give leave to amend to add additional allegations to resolve that on remand, we would be in a situation where our jurisdiction had not yet been established. If that's the case, is it consistent with Steel Company for us to, at this point, say anything about the merits, or would we have to await to see whether on remand jurisdiction is established and then the case comes back? Well, I think it would certainly be appropriate for the court to opine on the merits. Otherwise, you know, if the court is convinced that the claims as we've pled them are simply not valid as a matter of constitutional law... That's the hypothetical jurisdiction. I mean, Steel Company condemns the efficient resolution. I mean, because it's the whole theory of hypothetical jurisdiction is if the merits would resolve it one way or the other and move the jurisdictional issue, why bother with the jurisdictional issue? And Steel Company says we can't do that. So if we haven't settled our jurisdiction, can we say anything on the merits, or do we just have to remand it and otherwise be silent? Well, I think the court could pretermit the jurisdictional question by addressing the merits if you wanted to, but... How could we do that consistent with Steel Company? I would encourage the court to hold that we have adequately alleged... No, but my hypothetical was suppose we have not. I want to know what we do if that's what we do, and this is your opportunity to help me on that question. Well, I think we have at least at a minimum alleged standing. I mean, for one thing, and again, we'll be happy to submit a motion for judicial notice with respect to Orange County, which I think would fully square the circle that the court identified in your opinion, at least with respect to Plaintiff 7A. And if we are given an opportunity to amend, I think in light of the prior colloquy, we would and we will, in fact, add challenges to the additional provisions that my friend identified that the state believes also prohibit sharing of gender identity-related information with students. And finally, I would just mention on the... When you were here earlier, I specifically asked if we were to find that plaintiffs do not have standing, then we would not have jurisdiction to address the merits, correct? And you said correct. The answer now seems different. Why is that? I did ask that question earlier. Well, I don't think there's any doubt that we have sufficiently alleged a basis for standing in the complaint. And so I think the only real question is have we sufficiently shown through evidence, sufficient for a PI, that we have standing. And I understand the court's earlier opinion to be addressing that evidentiary question. I suppose if the court were to conclude that even under the allegations, construed as they must be in the light most favorable to the plaintiffs, that even under those allegations that we haven't established a basis for standing, then I think my prior answer is correct, that the court would not have jurisdiction to opine on the merits. But I think you clearly have, in my view, an ample basis for concluding that we have sufficiently alleged the requirements for standing. All right. Any further questions? No, thank you. All right. Thank you, counsel. We thank both counsel for your very helpful arguments in this case. And the case just argued is submitted, and we will stand adjourned. All rise. Hear ye, hear ye. All persons having had business with the Honorable the United States Court of Appeals for the Ninth Circuit shall now depart for this court for this session. Now stands adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Oh, my God. It's nice. Mm hmm. Let me get here. I'll go ahead and finish. Mm hmm.
judges: COLLINS, LEE, KOH